

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

AMY SOLEK, PERSONAL REPRESENTATIVE
OF THE ESTATE OF EMILY VICTORIA SOLEK,
DECEASED, AMY SOLEK AND BRENT SOLEK,
INDIVIDUALLY,

    Plaintiffs,

vs.                                                                                                       Case No. 21-cv-
                                                                                                             Hon.

K & B TRANSPORTATION, INC,
AN IOWA CORPORATION,
BROCK ACKERMAN,
KORY ACKERMAN, AND
JOHNNY STEWART

    Defendants.
_____/

MARC LIPTON (P43877)
STEFFANI CHOCRON (P45335)
LIPTON LAW CENTER, P.C.
Attorneys for Plaintiff
18930 W. Ten Mile Road
Southfield, Michigan 48075
(248) 557-1688
Marc@liptonlaw.com
_____/

## COMPLAINT

Plaintiffs Amy Solek, individually and in her capacity as Personal Representative of the Estate of her deceased daughter, Emily Victoria Solek, and Brent Solek, by her attorneys LIPTON LAW CENTER, P.C., complains against these Defendants as follows:

## INTRODUCTION

1.     This wrongful death action arises out of a catastrophic collision between a multi-ton tractor-trailer owned by Defendant K & B Transportation, Inc. (Hereinafter, "KB"), and operated by its employee, Johnny Stewart ("Stewart"). At or about 9:30 AM, at the end of a long

18930 W Ten Mile Rd
Suite 3000
Southfield, MI 48075

Phone: 248.557.1688
Fax: 248.557.6344

www.liptonlaw.com

night of driving, Stewart approached slowing traffic at the intersection of EB M-14 and the I-275 interchange. Stewart failed to stop in the assured clear distance, ambushing Emily Victoria Solek ("Emily") and ramming into the vehicle she was driving. Emily's vehicle, a 2017 Jeep Cherokee, was propelled into and crushed between the KB semi-truck and the cargo van in front of her, which then hit multiple other vehicles in a chain reaction collision. Emily's vehicle exploded, she was engulfed in flames, and she was burned beyond recognition.

2. While this precise collision was an unexpected calamity to the Solek family, it was not unexpected to KB that one of their drivers would cause a catastrophic crash. KB owns and operates the 141st largest private trucking fleet in the United States (as of 2019) and the 10th largest within the sub-field of refrigerated trucking fleets. As of December 2019, KB operated a fleet of 758 Tractors and 1465 Trailers. KB drove nearly 100 million miles in 2019 and a similar number in 2020. KB had already experienced its trucks being involved in multiple crashes, some with catastrophic results. KB, its officers, directors and employees knew that another catastrophic crash was always, and only, a matter of time.

3. KB's officers, co-Defendants Brock Ackerman and Kory Ackerman, sometime prior to the collision that took Emily's life and forever altered the life of her parents, sisters, family, and friends, chose to put their personal income over their duty as directors and officers of KB, by reducing the amount of insurance coverage the company had previously purchased and leaving KB woefully underinsured for the next catastrophic loss for which the company would be responsible. By reducing their insurance coverage, the Ackerman Defendants reduced KB's expenses, increasing corporate profits and thus directly increasing the Ackermans' personal income, all to the detriment of the Corporation and its employees, including co-Defendant, Johnny Stewart, and the public, including the Plaintiffs.

4. KB further failed to ensure that its over-the-road truckers, mostly operating at night, would be driving vehicles with safety devices installed to reduce the risk of catastrophic rear end collisions; instead, KB has slow-rolled the introduction of these collision avoidance mechanisms, improving Corporate profits, and thus, the co-Defendant Ackermans' income.

5. Co-Defendant Johnny Stewart, who upon information and belief remains under criminal investigation for both his actions and inactions that took the life of Emily Solek, AND for Federal and State crimes arising out of the possession and interstate transportation of child pornography, was repeatedly contacted, cajoled and pressured by KB to "get rolling" during his statutorily required "off-duty" hours during the nights and days prior to the collision, foreseeably impairing his natural wake-sleep cycle, contributing to the crash and the death of Emily.

6. Emily Solek, the victim of Defendants' combined acts of civil and criminal negligence and Corporate disloyalty, was killed just after her 21st birthday. Emily was a scholar-athlete with the highest accomplishments: she was a student at the ultra-competitive University of Michigan's Ross School of Business; she was a decorated State Soccer Champion; she was the center of a social world that has been devastated by her loss.

7. This action seeks full compensation from KB and the Ackerman Defendants (and from Stewart to the extent possible) for all individuals injured by them and for the Estate of Emily Solek, and her survivors. Defendants are responsible for damages in the multi-millions of dollars.

## PARTIES AND JURISDICTION

8. Plaintiff, Amy Solek, is a resident of the City of Rochester Hills, Michigan. She is the duly appointed Personal Representative of the Estate of Emily Victoria Solek, deceased, and the decedent's mother.

9. Plaintiff, Brent Solek is a resident of the City of Rochester Hills, Michigan. He is the decedent's father.

10. Defendant K & B Transportation is an Iowa corporation with its principal place of business in Sioux City, Nebraska. As such, it is a citizen of both Iowa and Nebraska; it is not a citizen of Michigan.

11. Defendant Brock Ackerman is and at all relevant times, was, the registered agent of K & B Transportation; he is also its Secretary, Treasurer and a Director of the Corporation. His registered agent address is listed with the Iowa Secretary of State in Sioux City, Iowa, which upon information and belief is his home address. His registered agent address is listed with the Nebraska Secretary of State as 4600 Dakota Ave, South Sioux City, Nebraska, which upon information and belief is KB's principal place of business. Brock Ackerman is, upon information and belief, a citizen of the State of Iowa.

12. Defendant Kory Ackerman is and at all relevant times, was, the President and a Director of K & B Transportation. Upon information and belief, he is a citizen of the State of Iowa, residing in Sioux City, Iowa.

13. Johnny Stewart is a citizen of State of Texas, with a domicile in the City of San Antonio.

14. The subject matter jurisdiction of this Court is based upon diversity of citizenship pursuant to 28 U.S.C. § 1332.

15. A substantial part of the events or omissions giving rise to the Plaintiffs' claims happened in the Eastern District of Michigan and the Defendants transact business within and are subject to personal jurisdiction in this district. Accordingly, venue is proper in this district, pursuant to 28 U.S.C. §1391.

16. The amount in controversy is in excess of seventy-five thousand dollars ($75,000.00), exclusive of interest and costs; indeed, the amount in controversy vastly exceeds the $2 million insurance policy available to Defendants for this loss, and satisfaction of any reasonable judgment will likely require substantial efforts on the part of Defendants to avoid Bankruptcy.

## K & B Transportation

17. K & B Transportation is a closely held, family-owned Corporation that was founded by Kory and Brock Ackerman's father, Ken Ackerman in 1987.

18. Kory Ackerman has worked at KB throughout his adult life.

19. Brock Ackerman has been working continuously at KB since 1993; in the early 1990s, Brock Ackerman worked in Florida as a CPA.

20. Over the past 3 decades, Defendants Brock and Kory Ackerman have become experienced, sophisticated owners of a large over the road trucking corporation. As such, they understood the dangers large tractor-trailers posed to the general public, and the risk that catastrophic accidents posed to KB's financial stability.

21. KB has a business model that requires most of its deliveries be completed in the morning hours, thus requiring KB drivers to spend 80% of their time driving at night and sleeping during the day. KB discloses to its new drivers that employment at KB specifically requires a willingness to drive at night, and sleep during the day. This pattern creates obvious safety risks known to KB.

22. Specifically, a driving schedule of the type demanded by KB disrupts the circadian rhythm of their drivers' natural sleep-wake cycle and places KB drivers at a high risk of drowsiness-related motor vehicle accidents, particularly catastrophic rear-end accidents.

23. KB is particularly sensitive to the need for on-time delivery. The goods they are transporting are perishable; their customers demand on-time performance to meet their own logistical imperatives.

24. KB's need for on-time delivery creates synergistic pressures on their drivers. KB repeatedly reminds their drivers to get started and make deliveries on time.

25. KB policies are also responsible for pressuring their drivers. KB company policy states that a driver who is late on two occasions can be fired for "gross misconduct," and lose eligibility to unemployment compensation. A driver who is late even one time to a "critical customer" (which includes Walmart, the customer Stewart serviced on the first half of the run at issue), can be fired for that single violation. KB specifically "advises" their drivers that firing for "gross misconduct" carries career threatening repercussions.

26. KB is also aware that distracted driving poses catastrophic risks to the general public.

27. Despite the dangers of distracted driving, KB boasts that its trucks have the latest convenience technology that allows drivers to connect their personal cell phones to their truck radios, tacitly, if not explicitly encouraging the use of cell phones on private calls while driving.

28. Across all of its public representations, there is no suggestion KB acknowledges these dangers – night time driving, on-time delivery pressures, or distracted driving - or that KB trains its drivers to address these issues. Instead, KB apparently relies entirely upon their drivers to decide for themselves how to balance these competing pressures and protect the public.

29. Further, despite KB's representation that it purchases "top of the line" equipment and that most of their trucks are "brand new," KB routinely puts older trucks on the road, without appropriate Forward Collision Accident and Mitigation Technology (FCAM).

30. At seven years old, the 2013 Freightliner KB driven by Stewart on the fateful trip was older than the normal use expectancy for a tractor trailer in the industry.

31. Further, despite KB's decision to provide some of their vehicles and drivers with FCAM, they did not pay for or install that technology on the vehicle at issue.

32. FCAM has proven to be a highly effective safety device in the prevention of catastrophic rear end accidents caused by driver inattention or sleepiness. Emily Solek would be alive today had the KB tractor been equipped with this technology.

33. KB is an experienced litigant. KB has been named as a party-Defendant nearly 30 times in the past 20 years as a result of personal injury and death caused by its drivers; more than half of those cases have been filed in the past 3 years.

34. The Ackerman co-Defendants also knew that industry-wide, the cost of truck claim settlements and jury verdicts has been rising regularly, particularly in the last 10 years.

35. In 2017, KB settled a disputed liability truck accident case during trial for $9.75M (Williams v. K & B Transportation, 2014-cv-6727, ED Pa., 2014).

36. After that settlement, and prior to the crash described herein, the Ackerman co-Defendants opted to risk KB's financial security by choosing to reduce the amount of insurance coverage available to protect its assets from a liability claim.

37. At the same time, the Ackerman co-Defendants continued to expense superfluous items thru the corporation, including but not limited to a "NetJets" private plan membership, such that the Corporation's operating ratio was an inefficient by industry standards, .94 or .95.

38. With the Ackerman co-Defendants level of sophistication and claims knowledge, the purchasing of only $2,000,000 in liability coverage was a conscious choice *to unreasonably*

*risk the Corporation's financial future* rather than obtain adequate insurance to protect the Corporation from financial disaster.

## LIABILITY OF DEFENDANTS FOR EACH CO-DEFENDANT'S ACTIONS

39. Plaintiff re-alleges and re-incorporates all prior allegations as if fully set forth herein.

40. At all relevant times, Stewart was driving a 2013 Freightliner, titled and registered to K&B Transportation.

41. At all relevant times, Stewart was acting during the course of, and within the scope of his employment with KB.

42. At all relevant times, Stewart was operating the KB owned Freightliner with KBs actual and implied consent.

43. KB, as the registered and titled owner of the 2013 Freightliner, is directly liable for all injuries arising out of its negligent operation and use, pursuant to MCL 257.401.

44. KB, as the employer of Stewart, is vicariously liable for all negligent errors, acts and omissions of Stewart that occur while he is acting during the course of, and within the scope of, his employment with them.

45. KB is also directly liable to Plaintiffs for its own negligent errors, acts and omissions as outlined herein.

46. Defendants Brock Ackerman and Kory Ackerman are not entitled to protection from liability for the negligent errors, acts and omissions of K&B Transportation and Stewart, for each of the following reasons, so far as is presently known:

   a. Failing to adequately insure the Corporation and its employees against foreseeable losses;

8

    b. Funneling personal expenses thru the Corporation, thereby reducing its available income that otherwise would have been available to ensure adequate safety devices were purchased and implemented;

    c. Hiring unnecessary employees, including family members, at inflated salaries and compensation packages, thereby funneling Corporate assets for non-Corporate related purposes;

    d. Fraudulently transferring assets away from the Corporation after learning of the events identified in Plaintiff's complaint, as well as other claims made against the Corporation, without regard to profits or losses, so as to attempt to improperly shield those assets from creditors or potential creditors;

    e. Failing to keep accurate and complete Corporate minutes and resolutions;

    f. Using the Corporate privilege for illegitimate ends to the prejudice of innocent third parties, such as Plaintiffs;

    g. Failing to adequately capitalize and re-capitalize the Corporation to keep pace with its nationwide network of clients and exposure to risks associated with that network, to the prejudice of innocent third parties, such as Plaintiffs;

    h. Failing to make adequate provision for creditors before taking distributions from the Corporation, thereby exposing the Corporation and its employees to financial ruin.

    i. Other actions as shall be revealed in discovery.

. **FACTUAL BASIS FOR CLAIM:**

47. Plaintiff re-alleges and re-incorporates all prior allegations as if fully set forth herein.

48. Co-Defendant Stewart began his trip on or about June 14, 2020, at the Mastar Supply Chain in Laredo, Texas, departing the facility on or about 13:06 CDT.

49. Stewart's initial destination was to a location in Denver, CO, where he arrived at or about June 16, 2020 at approximately 11:08 CDT, after "using" seven hours towards his maximum driving time.

50. KB dispatch instructed Stewart to depart for a KB critical customer, a Walmart in Cheyenne, Wyoming, no later than midnight on the evening of June 16/17, 2020. Stewart was delivering perishable goods, specifically including crates of tomatoes, from Mastronardi Produce Ltd.

51. During his off-duty times, on 6/16, prior to his departure, KB dispatch repeatedly contacted Stewart with instructions and messages.

52. On June 17, 2020 at 0038 and again at 205 AM, KB dispatch contacted Stewart, demanding to know if he was "rolling now." Stewart replied that he was at 206 AM.

53. Stewart was scheduled to arrive at Walmart on or about June 17, 2020 at or near 345 MDT.

54. In fact, Stewart arrived late at the Walmart in Cheyenne, WY; he arrived at or about 431 MDT.

55. Walmart employees rejected certain perishable goods being transported by Stewart.

56. Stewart was instructed to drive from Cheyenne, WY to Livonia, MI, to return the rejected goods to Mastronardi Produce, LTD, located on Plymouth Road, in Livonia, Wayne County, Michigan.

57. On June 18, at or near 2:26 PM CDT, Stewart arrived at or near Eldridge, IA to go off duty for the evening.

58. Despite his "off-duty" status, KB dispatch continued to contact Stewart, requesting that he complete "missing paperwork" and later demanding to know if Stewart was "rolling now."

59. Stewart began his trip from Iowa to Michigan sometime between 0130 and 0145 CDT.

60. Throughout his drive, Stewart repeatedly used his cellphone while driving – making and receiving phone calls and sending and receiving text messages and images.

61. Stewart's final two phone calls were excessive in the extreme: a call that started at approximately 5 AM EDT and lasted more than 3 hours (!), followed almost immediately by a second call that began on or about 851 EDT and lasted nearly another half hour.

10

62. Stewart, at the time of his last phone call and up to the collision, was traveling on EB M-14, in Wayne county, Michigan. Stewart intended to exit M-14 at Plymouth Road, east of the M-14/I-275 interchange.

63. As Stewart was driving the KB truck, the weather was clear, the skies were calm, there were no obstructions to his vision, and nothing prevented Stewart from seeing the traffic conditions in front of him.

64. Traffic on EB M-14 slowed due to an exit closure west of Stewart's expected exit. All drivers paying attention to the road and traffic conditions were able to keep their vehicles under control and avoid any collisions or near collision events.

65. Stewart failed to keep his KB Freightliner under control. Instead, he drove into the rear of the first vehicle ahead of him, at or near his full speed. That vehicle was a 2017 Grand Jeep Cherokee occupied by Plaintiff's decedent, Emily Solek.

66. Emily Solek was driving from Ann Arbor to her home in Rochester, Michigan, where her parents and siblings were waiting for her, so that they could celebrate her 21st birthday by driving together to northern Michigan.

67. The KB truck smashed the Solek vehicle, crushing it between the front of the tractor and the rear of a cargo van ahead of her. The KB and Solek vehicles caught fire.

68. Emily Solek sustained fright, shock, mortification, and conscious pain and suffering in her last moments, as she heard and/or saw the KB truck bearing down upon and ambushing her, before the impact fractured her skull, cervical spine and ribs, amputated her right leg above the knee, and caused severe, permanent and fatal internal injuries. Emily was consumed by the fire, as she was unable to escape or be retrieved from her burning vehicle.

69. Emily Solek's claim for damages is brought pursuant to the Michigan Wrongful Death Act, for all damages permitted thereunder, including all expenses associated with her death and all economic and non-economic damages, including the financial loss her Estate has suffered.

## **COUNT I: Liability of K & B Transportation, Brock Ackerman, Kory Ackerman and Stewart to Plaintiff, The Estate of Emily Victoria Solek, deceased**

70. Plaintiffs reallege and reincorporates all prior allegations as if fully set forth herein.

71. At all times, Defendants K & B Transportation, Brock Ackerman, Kory Ackerman and Stewart owed duties of reasonable care to all Plaintiffs, including the duty to comply with all applicable Federal, state and local statutes, regulations and ordinances, as well as industry practices.

72. Defendants Stewart breached those duties, in one or more ways, so far as is presently known, by each of the following, among other violations:

   a. Driving without due care and caution in violation of MCLA 257.626(b);
   b. Driving said motor vehicle upon the highway at a speed greater than that which would permit the driver to bring the vehicle to a stop within the assured clear distance ahead in violation of MCLA 257.627;
   c. Negligently failing to maintain a reasonably careful lookout for other traffic then lawfully upon the highway;
   d. In operating a motor vehicle with defective brakes, tires and other equipment, or in carelessly failing to maintain the brakes, tires or other equipment of said vehicle in reasonably good repair in violation of MCLA 257.627;
   e. Operating said motor vehicle at an excessive speed given the road conditions at the time of the accident, in violation of MCLA 257.627;
   f. By failing to warn by sounding a horn or otherwise in violation of MCLA 257.706
   g. Operating said motor vehicle distracted by a cell phone in violation of MCLA 257.602b;
   h. Carelessly following other motor traffic more closely than was reasonable or prudent;
   i. Failing to stop in an assured clear distance;

  j. Negligently operating a motor vehicle in a work zone and causing the death of a person in violation of MCL 257.601b

  k. Overtaking and striking the rear of Plaintiff's vehicle in violation of MCL 257.402

  l. Any such other negligence or gross negligence and violations of rules, regulations, and statutes as may be. shown at the trial of this matter.

73. Defendants K & B Transportation, Brock Ackerman and Kory Ackerman are vicariously liable for the negligent errors, acts and omissions of Stewart that occurred during the course of and within the scope of his employment, and further directly liable as owners of the Freightliner operated by Stewart pursuant to MCL 257.401.

74. Further, K & B Transportation, Brock Ackerman and Kory Ackerman owed Plaintiffs a duty to use reasonable care as an interstate transporter, with said duties established by common law, as well as applicable Federal, State and Local statutes, regulations and ordinances.

75. Defendants K & B Transportation, Brock Ackerman and Kory Ackerman breached their duties, in one or more of the following ways, so far as is presently known:

  a. K & B Transportation negligently and carelessly failed to properly select, hire, train, and or supervise their drivers including but not limited to Defendant Stewart;

  b. K & B Transportation negligently and carelessly put or allowed to remain on the road unqualified and/or reckless drivers including, but not limited to Defendant Stewart;

  c. K & B Transportation negligently and carelessly failed to screen, test, monitor and evaluate its drivers including, but not limited to Defendant Stewart;

  d. K & B Transportation negligently and carelessly failed to develop, promulgate, adopt, and/or implement safety policies, procedures and practices for its drivers including, but not limited to Defendant Stewart;

  e. K & B Transportation negligently and carelessly permitted, allowed, and/or failed to stop its drivers, including, but not limited to Defendant Stewart, from violating rules, regulations, and/or statutes regarding driver records and logs and/or the maintenance of the drivers' vehicles on the roadway;

  f. K & B Transportation negligently and carelessly failed to provide periodic systematic safety and/or defensive driving training for its drivers including, but not limited to Defendant Stewart;

  g. K & B Transportation negligently and carelessly failed to provide remedial training of its drivers including, but not limited to, Defendant Stewart;

    h. K & B Transportation negligently entrusted its vehicle and/or trailer to Defendant Stewart;

    i. Defendant K & B Transportation, Inc. negligently and carelessly failed to have in place an adequate safety program as required by the Federal Motor Carrier Safety Regulations;

    j. Defendant K & B Transportation, Inc. negligently and carelessly failed to ensure that its agents, employees and drivers, including Defendant Stewart, complied with the Federal Motor Carrier Safety Regulations.

    k. Defendant K & B Transportation, Inc. negligently and carelessly failed to ensure that its vehicles were equipped with appropriate FCAM, or to assign vehicles with FCAM to its newer and/or less experienced drivers;

    l. Defendant K & B Transportation, Inc. negligently and carelessly engaged in aiding, abetting, encouraging or requiring its drivers, including, Defendant Stewart to violate 49 CFR 390.13;

    m. Defendant K & B Transportation, Inc. negligently and carelessly engaged in scheduling a run which required its drivers, including, Defendant Stewart to operate his vehicle at speeds greater than those prescribed by the jurisdiction violating 49 CFR392.6;

    n. Defendant K & B Transportation, Inc. negligently and carelessly engaged in permitting and/or requiring its drivers, including, Defendant Stewart to drive a property-carrying vehicle beyond the maximum driving time violating 49 CFR 395.3; and

    o. Defendant K & B Transportation, Inc. negligently and carelessly engaged in permitting and/or requiring its drivers, including, Defendant Stewart to drive a commercial motor vehicle in hazardous conditions violating 49 CFR392.14

    p. Any such other negligence or gross negligence and violations of rules, regulations, and statutes as may be. shown at the trial of this matter.

76. As a direct and proximate result of the negligent errors, acts and omissions of Defendants K & B Transportation, Brock Ackerman, Kory Ackerman and Stewart, Plaintiff's decedent, Emily Victoria Solek, was crushed by Defendants' vehicle, suffered massive and fatal injuries, and died, resulting in Damages to her Estate and to her survivors, as outlined in the Michigan Wrongful Death Act.

## **COUNT 2: Liability of K & B Transportation, Brock Ackerman, Kory Ackerman and Stewart to Plaintiffs, Amy and Brent Solek for Negligent Infliction of Emotional Distress (Bystander liability)**

77. Plaintiffs reallege and reincorporate all prior allegations as if fully set forth herein.

78. At all relevant times, K & B Transportation, Brock Ackerman, Kory Ackerman and Stewart owed to the general public, including Plaintiffs Amy and Brent Solek, the duty to exercise reasonable care in their conduct, so as to prevent emotional injury to innocent bystanders who are immediate family relatives of the deceased.

79. Defendants K & B Transportation, Brock Ackerman, Kory Ackerman and Stewart breached their obligations to Plaintiffs thru their negligent errors, acts and omissions that resulted in the death of Emily Solek, as hereinbefore alleged.

80. At all relevant times, Amy and Brent Solek were members of Emily Solek's immediate family – they are her parents.

81. Amy and Brent Solek first suspected that their daughter was injured in a collision when they were alerted by the tracking features on their cell phones that she was no longer driving towards home on M-14.

82. Amy and Brent Solek began driving towards the crash scene from their home in Rochester Hills.

83. Shortly thereafter, they were confronted by a large back-up in traffic that had occurred on SB I-275 as a consequence of the crash.

84. On the way to the scene, Amy frantically called area hospitals, seeking information on the admission of her daughter to a local facility.

85. Amy and Brent Solek also reached out to members of the State Police, to determine if their daughter had been involved in the crash. They were told that a crash had occurred.

86. When they arrived at the scene, Amy and Brent saw the burning vehicles and identified the charred and crushed remains of the Grand Cherokee Jeep they recognized as the one Emily was driving. They also saw the overturned other vehicles and the smashed KB Freightliner.

87. When the investigating officers recognized Amy and Brent for who they were – the parents of the driver of the Jeep – they directed Amy and Brent first to the side of the road, and then instructed them to return home to wait for more information.

88. Amy and Brent Solek, in shock, waited first at the scene and then drove to their home in Rochester Hills, Michigan. Before returning home, they stopped at their church, seeking solace and comfort.

89. Later that evening, Amy and Brent were visited by the assigned and investigating officers who advised them that their daughter had not survived.

90. Amy and Brent then began the arduous task of informing Emily's grandparents and relatives of her passing.

91. Amy and Brent both suffered actual physical harm as a consequence of the shock they experienced at the accident scene. Both have suffered and are suffering from severe traumatic depressive reaction and mental anguish, have withdrawn from normal forms of socialization, have altered sleep patterns, headaches, and other manifestations of shock and mental anguish from witnessing the immediate aftermath of their child's death.

92. Brent and Amy Solek bring their own claims for damages under Michigan's law of negligent infliction of emotional distress, for the physical manifestation of the emotional anguish they suffered from being at the scene of the collision and their daughter's death, contemporaneously with the event.

### **COUNT 3: Liability of Brock and Kory Ackerman to Amy and Brent Solek for Intentional Infliction of Emotional Distress**

93. Plaintiffs reallege and reincorporate all prior allegations as if fully set forth herein.

94. At all relevant times, Defendants Brock Ackerman and Kory Ackerman owed a duty to Plaintiffs, Amy and Brent Solek, to act within the bounds of a civilized society and avoid extreme and outrageous conduct.

95. At all relevant times, Defendants Brock Ackerman and Kory Ackerman intentionally or recklessly failed to avoid extreme and outrageous conduct by: choosing to put vehicles on the road without FCAM even after making the choice to begin equipping some of their trucks with that life-saving technology; allowing their newer, less experienced drivers to operate their older, more dangerous vehicles rather than placing those vehicles under the control of more experienced and trusted operators; routinely disregarding their driver's federally mandated off-duty time; creating a system of sanctions and penalties that had the direct effect of encouraging their drivers to extend their hours beyond what was reasonable or permissible; hiring drivers with access to and use of child pornography; and other violations of common law, and Federal, State and local statutes, regulations and ordinances.

96. As a direct and proximate result of the intentional or reckless conduct outlined herein, Plaintiffs' Brent and Amy Solek suffered severe emotional distress and mental anguish as previously alleged, separate and apart from their suffering over the loss of their child.

WHEREFORE, Plaintiffs, Amy Solek, individually and as Personal Representative of the Estate of Emily Victoria Solek, deceased, and Brent Solek, request entry of judgment against Defendants, jointly and severally, for all damages to which they are entitled to, in an amount in excess of $2,000,000.00 (Two million and 00/100 dollars), together with costs, interest and attorney fees so wrongfully sustained.

|  |  |
|---|---|
|  | Respectfully submitted, |
|  | LIPTON LAW, P.C. |
|  | By /s/ MARC LIPTON<br>MARC LIPTON (P43877)<br>STEFFANI CHOCRON (P45335)<br>Attorneys for Plaintiff<br>18930 W, 10 Mile Road<br>Southfield, Michigan 48075 |
| Dated:  February 26, 2021 | (248) 557-1688 |